Filed 9/29/21

CERTIFIED FOR PUBLICATION

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>  Plaintiff and Respondent,<br><br>  v.<br><br>DANIEL DAWSON,<br><br>  Defendant and Appellant. | H047945<br>(Monterey County<br> Super. Ct. No. 17CR003245) |

Defendant Daniel Dawson was convicted by the court after a bench trial of a felony count of violating Government Code section 1090[1] (conflict of interest as to a contract entered into in his official capacity) and a misdemeanor count of violating section 91000 (failing to report an interest in real property under the Political Reform Act).[2] The court granted him probation.

On appeal, he contends that the trial court applied the wrong legal standard in convicting him of the section 1090 count because the court's remarks at the end of the court trial reflect that it failed to require the prosecution to prove beyond a reasonable doubt that an exception to section 1090 set forth in section 1091.5, subdivision (a)(3) "for remote or minimal interests" (*Lexin v. Superior Court* (2010) 47 Cal.4th 1050, 1074 (*Lexin*)) did not apply. We hold that the prosecution was not required to prove the inapplicability of the exception because it was an affirmative defense upon which defendant bore the burden of raising a reasonable doubt. We also reject his claim that the

---

[1] All statutory references are to the Government Code unless otherwise indicated.

[2] The Political Reform Act required defendant to report any interest in real property. (§§ 87200, 87203.)

court's remarks unambiguously reflected that it misunderstood the law. Accordingly, we affirm the probation order.

## I.    EVIDENCE PRESENTED AT TRIAL[3]

Defendant was hired as the City Manager of the City of Del Rey Oaks (the City) in 2009. In September 2015, he purchased a vacant lot at 815 Portola (the Portola lot) in the City. The Portola lot, which was "the last vacant lot" in the City, had a water meter but no water credits, and it "cannot be built upon without water credits." The value of a vacant lot with water credits is significantly greater than the value of a vacant lot without water credits. The prior owner of the Portola lot had purchased it for $20,000 a year and a half before he sold it to defendant for $50,000. The prior owner had contacted the City and the water district trying to obtain water for the lot, but he had never been able to obtain water rights or water credits. The City lacked any water credits and had no surplus water.

The City owned property at 899 Rosita (the Rosita property), which was part of Work Memorial Park. The Rosita property had an old well on it that had been used for irrigation only (because it did not provide potable water), but the well had become inoperative. In January 2015, the City leased the Rosita property for 10 years to Mitsugu Mori, who proceeded to operate a garden center on the Rosita property. Defendant signed the lease agreement with Mori on behalf of the City. The lease provided that Mori was to repair, maintain, and operate the existing well. However, Mori obtained all of his water from California American Water (Cal Am).

---

[3] After defendant was held to answer and his Penal Code section 995 motion was denied, the parties stipulated to a court trial based on the preliminary examination transcript, the exhibits from the preliminary examination, and several factual stipulations. The court trial consisted of a submission on the transcript, exhibits, and stipulations along with closing arguments.

Defendant told Kimberly Carvalho, the deputy city clerk and assistant to the city manager, that he had "ordered plans for a duplex and then a detached garage with another unit on top" for his Portola lot. He noted that the property had no water, but he said that he "was going to figure out a way to get water to it." Defendant spoke to the water district about transferring water credits from one property to another. The district informed him that water credits could not be transferred directly from a commercial property to a residential property. The credits would have to be transferred to the City, and then the City "could reallocate the credits to residential if they chose to do so." Defendant also asked whether credits could be transferred from Sand City to the City. In addition, he contacted Cal Am about getting water for his property. None of these efforts was fruitful.

Defendant told Mori that defendant wanted water so he could build a house on his Portola lot. Defendant asked Mori to switch to using well water on the Rosita property, but Mori was unable to locate a well head on the Rosita property as the well head had been paved over. Mori obtained a bid from Maggiora Brothers for drilling a well on the Rosita property, but Mori wanted to obtain additional bids because he thought Maggiora's bid was too high. However, defendant proceeded to enter into a contract on behalf of the City with Maggiora to drill a well on the Rosita property.

At a March 2016 City Council meeting, defendant represented to the City Council that Mori was paying $1,200 to $1,500 a month to Cal Am for water. In fact, Mori's water bills ranged from $300 to just over $600 per month. Defendant also represented to the City Council that water credits from the Rosita property "would be released into the city's jurisdiction and many parties would be able to do remodels."

After the City Council meeting, the water district's general manager informed defendant that his representation about the amount of water that would become available was inaccurate. The water district's general manager explained to defendant "how the water credit process really works" and pointed out that Mori's business "did not have a

3

valid water permit for its use." Consequently, any water credit would be limited to the prior lessee's use, which was either .237 acre-feet or .294 acre-feet. This amount of water would support "one and a half to two [single-family residences] normally. Possible even three depending on size." The water district manager and defendant discussed how the water credit from the Rosita property could be transferred to defendant's Portola lot. The water district manager told defendant that "the city would have to make the decision to release that water to him as a private homeowner." The water district manager assumed that the City had authorized defendant to have the water credits transferred to his Portola lot.

In August 2016, Maggiora drilled a well on the Rosita property, and the City paid the entire cost of $15,820 for the well drilling and $9,162.95 for a pump system. After the well was drilled, defendant instructed Mori to disconnect from the Cal Am water meter. As a result, Mori lost access to potable water for his buildings. He had to get bottled water at first, and he later connected back up to the meter.

Defendant filed an application with the water district to have water credits transferred from the Rosita property to the City and another application to have those credits transferred from the City to his Portola lot. Defendant believed that he could obtain nearly all of the water credits from the Rosita property for his Portola lot.

Although the defense tried to elicit evidence that the City Council would have been responsible for deciding who would receive water credits, if any were available, neither of the witnesses asked about this issue could provide such testimony. Carvalho testified only that "there used to be a waiting list" about a decade ago that had "disappeared," and that she did not know if it was up to the City or the water district to decide who received water credits. She did not know because the City had "never had any water in my [17-year] history." The water district manager testified that any decision about the use of water credits in the City's account would be made by "the city representative," not necessarily the City Council, and he was "not sure what [the City's]

4

process is." He testified that most cities in the water district gave the responsibility to the City Council; one city had a waiting list.

Defendant never reported his ownership of the Portola lot on his Form 700 disclosure as required by the Political Reform Act.[4]

## II. ARGUMENT, VERDICT, AND SENTENCING

Defendant's argument at trial was that the prosecution had failed to prove beyond a reasonable doubt that section 1091.5, subdivision (a)(3) did not apply. During an exchange with defendant's trial counsel, the trial court pointed out that it was "not entirely clear" from the evidence at trial "what the procedure would have been for the freed-up water credits." The court noted that defendant's trial counsel was arguing that defendant "would be held in the same position as any other member of the community, because of the existence of such a process. But I'm not sure that I see evidence of that process." The court questioned whether there was a "factual basis" for the defense claim that "the freed-up water credits would be submitted to some kind of fair process open to the constituents in Del Rey Oaks." Defendant's trial counsel was not able to point to any evidence identifying what the process would be. He argued that the prosecution was required to establish that defendant would have received "preferential treatments." Defendant's trial counsel argued, "we're going to assume a city would have a procedure for doling it out."

The court rejected defendant's claim that section 1091.5, subdivision (a)(3) applied. The court reasoned that defendant's act was "tailored in the sense that it benefits one person, because the amount of water available was not suited to benefit the constituents at large, but, rather, would benefit the only vacant lot in Del Rey Oaks, and, again, due to the timing and circumstances, only the Defendant would benefit." "[T]here

---

[4] He did tell other City employees and the City Council that he owned the Portola lot.

5

is only one person who's going to benefit from that service, that being the Defendant. The fact that the action was taken is what shows a tailoring toward the Defendant's benefit." The court found defendant guilty of both counts.

The court denied defendant's motion to reduce the section 1090 count to a misdemeanor. It suspended imposition of sentence and placed defendant on probation. Defendant timely filed a notice of appeal.

## III. DISCUSSION

Section 1090 provides: " Members of the Legislature, state, county, district, judicial district, and city officers or employees shall not be financially interested in any contract made by them in their official capacity, or by any body or board of which they are members." (§ 1090, subd. (a).)

Section 1091.5, subdivision (a) provides that "[a]n officer or employee shall not be deemed to be interested in a contract if his or her interest is any of the following: . . . (3) That of a recipient of public services generally provided by the public body or board of which he or she is a member, on the same terms and conditions as if he or she were not a member of the body or board."[5] (§ 1091.5, subd. (a)(3).)

"To determine whether section 1090 has been violated, a court must identify (1) whether the defendant government officials or employees participated in the making of a contract in their official capacities, (2) whether the defendants had a cognizable

---

[5] Although section 1091.5, subdivision (a)(3)'s language facially applies to only a "member" and not an "employee," this distinction appears to be simply an artifact of the legislative history of sections 1090 and 1091.5 rather than a decision by the Legislature to exclude employees from the scope of section 1091.5, subdivision (a)(3). When the language that is now subdivision (a)(3) was added to section 1091.5 in 1961 (as former subdivision (c)), neither section 1090 nor section 1091.5 included employees within its terms. Both sections were limited to members and officers. (Stats. 1961, ch. 381, §§ 1 & 2.) Both sections were amended in 1963 to add employees, but no change was made to the text of what is now subdivision (a)(3). (Stats. 1963, ch. 1950, § 2; Stats. 1963, ch. 2172, §1.) We assume for our purposes that subdivision (a)(3) applies to employees and is not restricted to only members.

financial interest in that contract, and (3) (*if raised as an affirmative defense*) whether the cognizable interest falls within any one of section 1091's or section 1091.5's exceptions for remote or minimal interests." (*Lexin*, *supra*, 47 Cal.4th at p. 1074, italics added.)

Defendant contends that, despite what he characterizes as "dictum" in *Lexin*, section 1091.5, subdivision (a)(3) is *not* an "affirmative defense," but instead part of the definition of the "interest" element of the section 1090 offense, and therefore the prosecution bore the burden of proving beyond a reasonable doubt that section 1091.5, subdivision (a)(3) did not apply.

Defendant relies solely on *Ex parte Hornef* (1908) 154 Cal. 355 (*Hornef*) to support his claim that section 1091.5, subdivision (a)(3) is not an affirmative defense. *Hornef* concerned a statute enacted in 1901 that criminalized the practice of dentistry without a license. The 1901 statute permitted the practice of dentistry without a license if, when the 1901 statute took effect, the person was lawfully practicing dentistry under the prior 1885 statute, which did not require a license but did require a certificate. (*Hornef*, *supra*, at pp. 358-359.) The issue before the California Supreme Court was whether the complaint charging the defendant with unlawful practice of dentistry was sufficient where the complaint did not allege that the defendant was not lawfully practicing under the 1885 statute when the 1901 statute took effect. (*Id*. at p. 358.) The California Supreme Court explained that "exceptions and provisos were to be negatived in the pleading only where they are descriptive of the offense or define it, and that where they afford matter of excuse merely, they are to be relied on in defense." (*Id*. at p. 360.) It held that the complaint was not required to allege the exception for lawful practice under the 1885 statute because that exception was not descriptive of the offense nor did it define the offense. Instead, the exception merely exempted certain persons. (*Id*. at p. 362.)

*Hornef* does not support defendant's claim that the California Supreme Court incorrectly described section 1091.5 as an affirmative defense in *Lexin*. Section 1091.5

does not describe or define the section 1090 offense but instead describes situations in which, despite the existence of a conflict of interest, the Legislature has decided to excuse the conduct. " ' "It is well established that where a statute first defines an offense in unconditional terms and then specifies an exception to its operation, the exception is an affirmative defense to be raised and proved by the defendant." ' " (*People v. Neidinger* (2006) 40 Cal.4th 67, 75.) Section 1091.5 was accurately described by the California Supreme Court in *Lexin* as an affirmative defense. Consequently, the prosecution did not bear the burden of proof beyond a reasonable doubt that the section 1091.5, subdivision (a)(3) exception did not apply. Instead, defendant bore the burden of raising a reasonable doubt about whether section 1091.5, subdivision (a)(3) applied.[6] (*Neidinger*, *supra*, at pp. 75-76.)

We perceive no error in the trial court's determination that defendant had failed to satisfy this burden.[7] Where, under the circumstances, "it is impossible to demonstrate conclusively that other nonofficials would have received similar terms . . . section 1091.5[, subdivision] (a)(3) would not shield the [interest] from conflict of interest prohibitions." (*Lexin*, *supra*, 47 Cal.4th at p. 1089.) "Thus, a party asserting section 1091.5[, subdivision] (a)(3) as a defense must establish that other constituents of an agency received, or would have received, similar terms." (*Id.* at p. 1089.) "Discretion

---

[6] Defendant argues that he and his trial counsel "litigated this case under the reasonable . . . belief that the prosecution, not the defense, bore the burden to disprove application of the public services exception." "Had Appellant been on notice the burden was his, assuming that were a correct statement of the law, he could have chosen to litigate differently, perhaps opting for a full bench trial or a jury trial, to ensure he presented sufficient evidence on this point." Since the California Supreme Court very clearly stated in *Lexin* (dictum or not) that section 1091.5, subdivision (a)(3) was an affirmative defense, defendant was "on notice the burden was his" and cannot reasonably claim otherwise.

[7] Defendant argues that the prosecution did not prove beyond a reasonable doubt that section 1091.5, subdivision (a)(3) did not apply. Since the prosecution did not bear that burden, his argument fails.

8

in either (1) *who* receives a benefit or (2) *how much* of a benefit one should receive renders any benefit incomparable; one cannot determine whether the board members have in fact received the benefit on the same terms and conditions as would have been the case for other, nonboard members. Special tailoring is forbidden; discretion in the allocation of a benefit raises the specter that such special tailoring might have occurred." (*Id.* at pp. 1099-1100.)

The trial court accurately pointed out that no evidence had been presented in support of defendant's claim that the water credits would have been "generally provided . . . on the same terms and conditions" to other citizens. (§ 1091.5, subd. (a)(3).) The only two witnesses who were questioned on this point testified that they did not know how the water credits would have been allocated. As defendant bore the burden of raising a reasonable doubt on this issue, the trial court, as the factfinder, could reasonably conclude from defendant's failure to produce evidence on this point that he had failed to carry his burden. It follows that the trial court did not err in rejecting defendant's affirmative defense.

Defendant insists that the trial court erred because its remarks at the end of the court trial "reflect the trial court's consideration of [defendant's] motivation," which, in defendant's view, reveals an "improper focus" demonstrating that the court misapplied the law. "As a broad general proposition, cases have stated that a trial court's remarks in a bench trial cannot be used to show that the trial court misapplied the law or erred in its reasoning. [Citations.] These statements are founded on the principle that, in a criminal bench trial, the trial court is not required to provide a statement of decision and that any explanation of his or her decision a trial judge provides is not part of the record on appeal. [Citation.] [¶] This broad proposition has been subjected to an important limitation. Without discussing whether a trial judge's statements are part of the record on appeal, . . . we may nonetheless consider a judge's statement when, *taken as a whole,* the judge's statement discloses an incorrect rather than a correct concept of the relevant law,

9

'embodied not merely in "secondary remarks" but in [the judge's] basic ruling.' [Citations.]" (*People v. Tessman* (2014) 223 Cal.App.4th 1293, 1302-1303.) This limitation on the general rule applies only where "the court's comments *unambiguously* disclose that its basic ruling embodied or was based on a misunderstanding of the relevant law." (*In re Jerry R.* (1994) 29 Cal.App.4th 1432, 1440, italics added.)

Here, the trial court's remarks do not *unambiguously* demonstrate that the court misunderstood the law. The court's explanation for its ruling reflected that the court had carefully considered whether defendant had met his burden of raising a reasonable doubt about whether section 1091.5, subdivision (a)(3) applied. The court's comments about defendant's motivation were not inappropriate since the prosecution was required to prove that defendant "kn[e]w that there is a reasonable likelihood that the contract may result in a personal financial benefit to him." (*People v. Honig* (1996) 48 Cal.App.4th 289, 338.) Because his motivation demonstrated his knowledge, the court properly considered it.

## IV. DISPOSITION

The probation order is affirmed.

_____

ELIA, ACTING P.J.

WE CONCUR:


_____

BAMATTRE-MANOUKIAN, J.


_____

DANNER, J.


*People v. Dawson*
H047945